HICKENLOOPER v. CHRISTY et al.

(Circuit Court of Appeals, Ninth Circuit. May 13, 1912.)

No. 2,054.

SUBROGATION (§ 23*)—PERSON LENDING MONEY TO RECEIVER TO DISCHARGE INCUMBRANCE.

A complainant who lent money to the receiver for an insolvent corporation to pay off a decree foreclosing a mortgage on property of the corporation, for which under the order of the court he was entitled to a mortgage on the property, *held* not to have established a claimed agreement with the receiver or the owners of a second mortgage that his

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

should be a first lien, and not entitled to be subrogated to the lien of the mortgage, which was satisfied.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 60–66; Dec. Dig. § 23.*]

Appeal from the Circuit Court of the United States for the District of Idaho.

Suit in equity by Charles A. Hickenlooper against T. H. Christy, the Crystal Springs Investment Company, Limited, and W. J. D'Arcy, receiver of said company. Decree for defendants, and complainant appeals. Affirmed.

J. D. Skeen, of Salt Lake City, Utah, for appellant.
Hansbrough & Gagon and John W. Jones, all of Blackfoot, Idaho, for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This is a suit by appellant for subrogation to the rights of one S. J. Rich, a prior mortgagee of certain real property, for a revival of the mortgage, for decree against the Crystal Springs Investment Company, and for a foreclosure of the revived mortgage and sale of the mortgaged premises, the proceeds to be applied upon such decree.

The undisputed facts upon which the suit is based are these: On the 8th day of July, 1907, one Thomas G. Clegg and wife executed their mortgage to Rich upon certain lands of which Clegg was the owner, consisting of 331 acres, more or less, to secure the payment of their promissory note of $1,400 given at the same time. Before September 25, 1908, Clegg and wife sold and conveyed the property covered by the mortgage to the Crystal Springs Investment Company, Limited, and on that date the Investment Company executed a mortgage back to Clegg to secure the payment of $2,080, the same being subject to the Rich mortgage. On October 26, 1908, Clegg sold and assigned his mortgage against the Investment Company to the Brown-Hart Company, Limited, and on February 23, 1909, he sold and assigned all remaining and existing right in said mortgage to the defendant T. H. Christy. Christy was the cashier of the First National Bank of Blackfoot, and in reality the latter assignment was for the use and benefit of the bank. Later, to wit, on April 20, 1910, the Brown-Hart Company assigned all its right and interest in the mortgage to Christy. The Rich mortgage having been foreclosed, the real property covered by it was on June 30, 1908, sold at sheriff's sale, and Rich himself became the purchaser. This entitled him to a deed at the end of one year from that date; that being the statutory time for redemption under foreclosure sale in Idaho. The Investment Company becoming insolvent, the defendant W. J. D'Arcy was appointed receiver, and on June 28, 1909, the receiver petitioned the District Court of the state of Idaho, in and for Bingham county, being the court by which he was appointed receiver, for authority to borrow

$2,500 with which to redeem the property from sale under the Rich mortgage. In pursuance of such petition, the court granted the order prayed for, authorizing and directing the receiver to borrow such sum as might be deemed necessary to redeem the said property from sale, not to exceed $2,500, and to execute a mortgage upon the property as security for the payment of such loan as might be obtained. These facts having been alleged, it is further set forth in the complaint as follows:

"Your orator further says that he was solicited by the said receiver and by the defendant, T. H. Christy, his predecessors in interest, and the stockholders and subsequent lien claimants of the real estate described in paragraph No. 3, to advance the said sum of twenty-five hundred dollars ($2,500.00) with which to redeem said real estate from said sale to S. J. Rich, and the said receiver contracted and agreed with him that the repayment of the said money so loaned would be secured by a first mortgage upon said real estate, and the said defendant T. H. Christy, and his predecessors in interest, agreed with your orator that his loan should be prior to all other liens; that pursuant to said agreement with the said receiver and with the defendant, T. H. Christy, and his predecessors in interest, believing that the court would make the order set out as Exhibit E, and to save said property for the benefit of all interested therein, on the 30th day of June, 1909, your orator advanced two thousand twelve dollars and seventy-six cents ($2,012.76) to the said receiver, which said money was actually used by him in paying the judgment of the said S. J. Rich and redeeming the property described in paragraph 3 from said lien, judgment, and foreclosure: that said receiver failed to make, execute, and deliver to your orator a mortgage upon the said real estate set out in paragraph 3; that on the 1st day of July, 1910, your orator demanded payment of said receiver of the sum of two thousand twelve dollars and seventy-six cents ($2,012.76), with interest thereon at the rate of 12 per cent. per annum from the 30th day of June, 1909, to the 30th day of June, 1910, together with a reasonable attorney's fee; that said receiver duly allowed said claim, except as to attorney's fees, but refused payment for the reason that he had no funds or assets with which to make payment of said claim; that thereafter, on said 2d day of July, 1910, upon motion, the district court for the county of Bingham, state of Idaho, granted your orator leave to institute suit against the said receiver in any court of competent jurisdiction to establish a lien upon the real estate described in paragraph 3 and to have said lien declared a first lien upon said property and to secure such other and further relief as the court should adjudge him to be entitled to."

It was further proven at the trial that the complainant on June 30, 1909, advanced to the receiver the sum of $2,012.76, which sum was used by the receiver in payment to the sheriff of the Rich decree of foreclosure; that the property decreed to be sold, and which was sold by the sheriff, was thereby redeemed from the sheriff's sale to Rich, and the lien of the decree discharged; also, that the receiver has not executed the mortgage to complainant to secure the repayment of the money so advanced by the latter, although he stands ready to do so at any time the complainant is ready to accept the same. The claim for said sum so advanced has been allowed by the receiver against the estate of the Investment Company, but the receiver was unable to pay the same for lack of funds. Christy has also instituted suit to foreclose the mortgage executed to Clegg; it being the second mortgage on the premises. The complainant further admits upon the witness stand that he was solicited neither by Christy, his predecessors, the stockholders of the Investment Company, nor subsequent lien claimants of the premises covered by the mortgage to advance the money in ques-

196 F.—31

tion, and that he went too far in his allegations in the complaint to the effect that he was so solicited by such parties.

This leaves but one question, and that a question of fact to be determined under the evidence, which is whether the receiver contracted and agreed with the complainant that the repayment of the money loaned the receiver, namely, the $2,012.76, should be secured by a first mortgage upon the land, and whether Christy and his predecessors in interest agreed with complainant that his loan should take precedence over all other liens. Concerning this matter the complainant testifies as follows:

"Q. I will ask you whether or not you had a conversation with Mr. Christy on or about the 28th day of June, 1909. A. Yes, sir.

"Q. You may relate the conversation. A. I think, though, that it was the 29th or 30th when I had the conversation with him.

"Q. The 29th? A. Either the 29th or 30th.

"Q. You may relate the conversation and the circumstances leading up to it. * * * A. I asked Mr. Christy if he was going to take care of that property, or whether he was going to let it go by default, and he said he was going to let it go; that he had other collateral for his security, and wasn't sufficiently interested to take care of it. I then asked him if I would take care of it if he would allow my mortgage to take first place, and his remain just as it was then, and he said he thought that could be arranged, providing the Brown-Hart people that were interested in the deal were willing, and he advised me to see them in regard to it. That was about the sum and substance of our conversation. We talked quite a while, but that was about the sum and substance of it.

"Q. Then what did you do after that conversation? A. We then went around to the Brown-Hart store, and met Mr. Brown I believe it was. I hadn't met him before or since, but I think it was Mr. Brown, if I remember right—one of the interested parties.

"Q. One of the members of the Brown-Hart Company? A. Yes; and had a similar conversation with him, and told him what Mr. Christy had said in regard to the matter, and asked him if they would be willing to the same, and he said—

"Q. Willing—now then, just complete that—willing to what? A. Willing, providing I redeemed this property, that my mortgage should take the first place, or stand just where it did, and their mortgage keep the same place as it was at the time; and he said he thought that that could be arranged, but that there were others interested in it, but, if Mr. Christy was willing, he thought it could be arranged; something to that effect."

Complainant's conversation with these parties was had the day before the time for redemption of the land from sheriff's sale expired. It further appears that the conversation was had with Hart, instead of Brown. On complainant's arrival at Ogden, he arranged with a bank there for the money, and it was arranged, through telephone, that the Blackfoot State Bank should pay the money to D'Arcy with which to redeem the land from sale. D'Arcy accordingly made the redemption. On cross-examination complainant testifies, as interrogated:

"Q. And Mr. Christy told you he thought it could be arranged? A. Yes, sir.

"Q. That is all he told you? A. Yes, sir; and he advised me to go and see the Brown-Hart people and see if they were willing, and he said if they was, he thought it could be arranged all right.

"Q. And you went to see the Brown-Hart people? A. Yes, sir.

"Q. And saw Mr. Brown? A. Yes, sir.

"Q. And Mr. Brown told you that he thought it could be arranged, did he? Now, just what did he say? A. Well, he told me very similar to what Mr.

Christy did. If Mr. Christy had no objection, he thought they could arrange that part all right.

"Q. And you didn't go back to either Mr. Brown or Mr. Christy to see whether they would arrange it or not? A. Well, I think Mr. Brown stated that his partner wasn't there at the time, and he would have to talk it over with him, or something to that effect.

"Q. Then, he couldn't do anything until he would see his partner? A. No."

As to his relations with D'Arcy, witness continues:

"Q. Well, did Mr. D'Arcy— Now, do I understand you to say that Mr. D'Arcy positively promised you—you allege that, and I am trying to get at it—promised you at the time you advanced this money that you should have a first mortgage on that property? A. Well, Mr. D'Arcy said that he would do all he could in his power for me to get that. * * * Now, he and I were working along together along those lines, with that understanding, and the other people gave me to understand that they would do that; and that is the way I left it."

Upon the other hand, Christy testifies, in effect, that he never had such a conversation with complainant as the latter testifies to; that he could not have had it, as he was away from Blackfoot at the time, attending the fair at Seattle, and did not return until July 3d. He further says that the redemption of the mortgage or the land from sale took place while he was at Seattle, and that he talked the matter over with complainant after that, but refused to subordinate his mortgage, then held by the bank, to complainant's claim for the money advanced for the purpose of the redemption. Mr. Hart testifies that complainant came and asked in regard to the release of the mortgage and taking a new mortgage in second place. He says:

"I told him that I would have to see our attorney, Mr. Jones, before I could give him any answer on the proposition, which I did; and I didn't see Mr. Hickenlooper afterwards, and never heard of him afterwards on the question."

It is not clear whether this conversation was before or after the redemption. Mr. D'Arcy is positive that he never had any understanding or agreement with the complainant to give him a first mortgage.

Now, upon this testimony, the complainant himself shows that no final agreement was ever entered into between himself and Christy or the Brown-Hart Company, whereby he should have a prior mortgage for the money advanced for the redemption. According to his story, there was some talk about the matter with both Christy and Hart, representing Brown-Hart Company, but the minds of the parties never fully met, and the agreement was not consummated. On the other hand, Christy denies that he ever had such a conversation with the complainant as complainant relates; and Hart says, while there was some talk upon the subject, he (Hart) told complainant that he could give him no answer until he saw his attorney, and that he did not talk with complainant about the matter afterwards. D'Arcy is positive there never was any such agreement with him. So that, upon the whole, there can be no question that complainant has wholly failed to sustain his contention, and must therefore fail in the controversy.

It would seem there was a strong inducement for complainant doing as he did in advancing the money with which to make the redemption. He held a large block of stock in the Investment Company, amounting

on its face value to $12,000. The redemption would, of course, inure to the benefit of the Investment Company, and through his holding such stock to himself. He displayed great anxiety to prevent the sale from passing beyond the power of redemption, in which event the land would be lost entirely to the Investment Company; and, while perhaps he did have some conversation with Christy and Hart about the redemption and the propriety of his taking a first lien, yet he took things for granted looking toward such an agreement that never reached the stage of a final meeting of minds upon the subject, or any consummation of the supposed agreement.

The decree of the Circuit Court will be affirmed; and it is so ordered.